

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

2016 JUN 17  P 3:46

WILLIAM W. BLEVINS
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**FELONY**

**INDICTMENT FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD AND WIRE FRAUD, HEALTH CARE FRAUD, CONSPIRACY TO PAY HEALTH CARE KICKBACKS, AND FORFEITURE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL ACTION NO. **16-110** |
| VERSUS | * | SECTION: **SECT. A MAG. 1** |
| LOUELLA GIVENS | * | VIOLATIONS: 18 U.S.C. § 1349 |
| CRYSTAL SOLOMON | | 18 U.S.C. § 1347 |
| a/k/a Crystal Laurent | | 18 U.S.C. § 371 |
| ZANDRIA JOHNSON | * | 18 U.S.C. § 2 |
| | | 18 U.S.C. § 982 |
| | * | |

\*   \*   \*

The Grand Jury charges that:

## COUNT ONE
### Conspiracy to Commit Health Care Fraud and Wire Fraud (18 U.S.C. § 1349)

A.  **AT ALL MATERIAL TIMES HEREIN:**

### The Medicare Program

1. The Medicare Program (Medicare) was a Federal health care program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the United States Department of Health and Human Services (HHS) through its agency, the Centers for Medicare & Medicaid Services (CMS).

X  Fee___OA___
___ Process_____
X  Dktd_____
___ CtRmDep_____
___ Doc. No.____

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

3. "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency (HHA) to beneficiaries who required home health care services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than directly to the beneficiary.

4. "Part B" of the Medicare program covered certain physician services, outpatient and other services, that were medically necessary and were ordered by licensed medical doctors or other qualified health care providers.

5. Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare number, the services that had been performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider that ordered the services.

## Reimbursements for Home Health Services

6. Medicare Part A, through a Medicare contractor, reimbursed 100 percent of the allowable charges for participating HHAs providing home health care services only if a patient qualified for home health care services. A patient qualified for home health care services only if:

   a. the patient was confined to the home, also referred to as "homebound";

   b. the patient was under the care of a physician who specifically determined that there was a need for home health care and established the Plan of Care (POC); and

   c. the determining physician signed a certification statement specifying that (1) the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy, (2) the beneficiary was confined to the home, (3) that a POC for furnishing services was established and periodically reviewed, and (4) that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7. HHAs were reimbursed under the Home Health Prospective Payment System (PPS). Under PPS, Medicare paid Medicare-certified HHAs a pre-determined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care." The base payment was adjusted based on the health condition and care needs of the beneficiary. This adjustment was done through the Outcome and Assessment Information Set (OASIS), which was a patient-assessment tool for measuring and detailing the patient's condition. If a physician determined that the beneficiary was still eligible for care after the end of the first episode of care, the physician could re-certify that the beneficiary qualified to receive home health services, and a

second episode could commence. There were no limits to the number of episodes of home health benefits a beneficiary could receive, as long as a physician certified that the beneficiary qualified to receive home health care services in accordance with Medicare's requirements.

### Record Keeping Requirements

8.     Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the home health agency. These medical records were required to be sufficient to permit a Medicare contractor or auditor to review the appropriateness of Medicare payments made to the home health agency under the Part A program.

9.     Medicare required that a HHA maintain the written records required to document the propriety of home health care claims submitted under Part A, including a POC that contained the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and physician signature. Medicare also required providers to maintain an OASIS for the patient and a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services.

10.     Medicare Part A regulations required provider HHAs to maintain medical records of each visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or

symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health, or to facilitate treatment of the beneficiary's primary illness or injury.

11.  "Part B" of the Medicare program covered certain physician services, outpatient and other services, that were medically necessary and were ordered by licensed medical doctors and other qualified health care professionals.

### The Medicare Providers

12.  Bayou River Health Systems, Inc. (Bayou River, also doing business as House Call, House Call 2000 Home Health Care Agency, and Home Care Associates) was a Louisiana corporation incorporated on June 8, 1992. Bayou River purported to provide home health care and related services to Medicare beneficiaries. Bayou River obtained a Medicare provider number and was eligible to receive payments from Medicare. From on or about January 1, 2008 through on or about December 31, 2011, Bayou River submitted approximately 4,724 claims for approximately 808 separate beneficiaries, amounting to approximately $9,256,313. Medicare paid approximately $7,609,764 on these claims.

13.  Maxima Home Health Care Corporation (Maxima, also doing business as Titan Management Services, LLC), was a Louisiana corporation incorporated on October 6, 1992. Maxima purported to provide home health care and related services to Medicare beneficiaries. Maxima obtained a Medicare provider number and was eligible to receive payments from Medicare. From on or about July 8, 2007 through on or about June 16, 2015, Maxima submitted

approximately 2,820 claims for approximately 328 separate beneficiaries, amounting to approximately $3,890,519. Medicare paid approximately $3,325,800 on these claims.

14. Maxima continued the business practices of Bayou River, employing many of the same officers, managers, employees, and agents, relying upon many of the same physicians, and billing Medicare for services purportedly rendered to many of the same Medicare beneficiaries.

### The Defendants

15. **LOUELLA GIVENS (GIVENS)**, a resident of New Orleans, Louisiana, was an owner and operator of Bayou River/Maxima, and controlled and directed operations at these companies.

16. **CRYSTAL SOLOMON a/k/a Crystal Laurent (SOLOMON)**, a resident of Marrero, Louisiana, was the Director of Nursing of Bayou River/Maxima.

17. **ZANDRIA JOHNSON (JOHNSON)**, a resident of New Orleans, Louisiana, was a registered nurse (RN) who certified patients for home health care at Bayou River/Maxima.

**B.  THE CONSPIRACY:**

18. Beginning in or around June 1992 and continuing through June 2015, in the Eastern District of Louisiana, and elsewhere, defendants **LOUELLA GIVENS, CRYSTAL SOLOMON, ZANDRIA JOHNSON** and others known and unknown to the grand jury, knowingly and willfully did combine, conspire, confederate, and agree with each other and with each other

a. to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent

6

pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

      b.    to knowingly and willfully devise and intend to devise, a scheme and artifice to defraud Medicare, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### C.    PURPOSE OF THE CONSPIRACY:

19.    It was a purpose of the conspiracy for **GIVENS, SOLOMON, JOHNSON** and co-conspirators known and unknown to the Grand Jury, to unlawfully enrich themselves by, among other things, (a) obtaining and arranging for the use of Medicare beneficiary numbers as the bases of fraudulent claims filed for home health care services that were not medically necessary, and in some instances not provided; (b) through the use of interstate wires, submitting and causing the submission and concealment of false and fraudulent claims to Medicare, the receipt and transfer of the proceeds from the fraud, and the payment of cash and bribes in exchange for Medicare numbers; and (c) diverting and causing the diversion of the proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

**D.     MANNER AND MEANS OF THE CONSPIRACY:**

20.     The manner and means by which the defendants and co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

21.     In or around October 2006 and December 2011, **GIVENS** and co-conspirators obtained or renewed Medicare provider numbers for Bayou River/Maxima, certifying to Medicare that operators of Bayou River/Maxima would abide by Medicare laws, regulations and program instructions, in order to submit to Medicare claims for home health services.

22.     As an owner and operator of Bayou River/Maxima, **GIVENS** and co-conspirators obtained and maintained signature authority for corporate bank accounts of Bayou River and Maxima, including Liberty Bank Account Nos. xxxx860, xxxx060, xxxx078, xxxx110, and xxxx4485, Hibernia Account No. xxxxxxx188, Capitol One Account No. xxxxxx241, Chase Account Nos. xxxxxx259, xxxxxx339, xxxxxxx581, xxxxxx829, xxxxxxx533, xxxxxxx261, xxxxxx918, xxxxxx064, and xxxxxx169, and First NBC Account Nos. xxxxxx127 and xxxxxx863.

23.     Thereafter, **GIVENS, SOLOMON, JOHNSON** and co-conspirators devised and participated in a scheme to (1) pay patient recruiters and employees, directly or indirectly, in exchange for referring Medicare beneficiaries to Bayou River/Maxima so that Bayou River/Maxima could bill Medicare for home health care and related services purportedly rendered to these recruited beneficiaries; (2) hire as employees at Bayou River/Maxima nurses, aides, and other persons in exchange for their provision of Medicare beneficiary names and numbers that would be used at Bayou River/Maxima to bill Medicare for home health care and

related services; and/or (3) recruit beneficiaries to Bayou River/Maxima from other HHAs that were engaged in billing Medicare for services to Medicare beneficiaries that were not medically necessary and/or were not provided, including Memorial Home Health, Inc., Interlink Health Care Services, Inc., Lakeland Health Care Services, and Lexmark Healthcare, LLC.

24. Licensed physicians known and unknown to the Grand Jury (1) referred beneficiaries to Bayou River/Maxima for home health services and (2) signed home health referrals, orders, POCs and other documents, without regard to the actual medical condition of the beneficiaries, so that Bayou River/Maxima could bill Medicare for home health care services that were not medically necessary and, in some instances, were not provided.

25. **GIVENS, SOLOMON, JOHNSON** and co-conspirators known and unknown to the grand jury falsified, fabricated, altered, and caused the falsification, fabrication, and alteration of, Bayou River/Maxima medical records, including home health certifications and plans of care, therapy notes, evaluations, discharge and re-certification orders, and other records to support claims for home health care services that were not medically necessary and, in some instances, were not provided.

26. **GIVENS, SOLOMON, JOHNSON** and co-conspirators known and unknown to the Grand Jury, through the use of interstate wires, submitted and caused the submission of approximately $13,146,832 in claims to Medicare Part A for home health care and related services, when a substantial majority of these services were not medically necessary and/or were not provided. Medicare paid approximately $10,935,564 on these claims.

27. Medicare payments based upon fraudulent claims submitted by Bayou River/ Maxima were deposited into bank accounts established by **GIVENS** and co-conspirators on

behalf of Bayou River/Maxima, and proceeds were paid out to **SOLOMON, JOHNSON** and co-conspirators known and unknown to the Grand Jury.

28. **GIVENS, SOLOMON**, and **JOHNSON** benefitted from the scheme because, among other reasons, they and co-conspirators paid, or caused to be paid, hundreds of thousands of dollars to themselves and members of **GIVENS's** family from the proceeds of the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO AND THREE
### Health Care Fraud (18 U.S.C. § 1347)

A. **AT ALL TIMES MATERIAL HEREIN:**

29. Paragraphs 1 through 28 above, of this Indictment are re-alleged and incorporated as though fully set forth herein.

B. **THE OFFENSES:**

30. On or about the dates enumerated below, in the Eastern District of Louisiana, and elsewhere, the defendants, **LOUELLA GIVENS, CRYSTAL SOLOMON, ZANDRIA JOHNSON** and others known and unknown to the Grand Jury, did knowingly and willfully cause to be submitted to Medicare the following false and fraudulent claims for payment:

| Count | Beneficiary | ICN | Date Claim Submitted | Dates of Service | Amount Billed | Defendants |
|---|---|---|---|---|---|---|
| 2 | M.S. | 213339012 33904LAR | 12/05/13 | 10/06/13 – 12/03/13 | $2,470.01 | LOUELLA GIVENS ZANDRIA JOHNSON |
| 3 | K.C. | 213315010 61904LAR | 11/11/13 | 09/11/13- 11/09/13 | $1,420.01 | LOUELLA GIVENS CRYSTAL SOLOMON ZANDRIA JOHNSON |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT FOUR
### Conspiracy to Pay and Receive Health Care Kickbacks (18 U.S.C. § 371)

**A.     AT ALL TIMES MATERIAL HEREIN:**

31.     Paragraphs 1 through 17 of this Indictment are re-alleged and incorporated as though fully set forth herein.

**B.     THE OFFENSE:**

32.     From in or around June 1992, and continuing through in or around June 2015, in the Eastern District of Louisiana, and elsewhere, defendants **LOUELLA GIVENS** and **ZANDRIA JOHNSON** did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is,

a.      to knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare;  in violation Title 42, United States Code, Section 1320a-7b(b)(1); and,

b.      to knowingly and willfully offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging

11

for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; in violation of Title 42, United States Code, Section 1320a-7b(b)(2).

C.   **PURPOSE OF THE CONSPIRACY:**

33.   It was a purpose of the conspiracy for **LOUELLA GIVENS, ZANDRIA JOHNSON** and co-conspirators to unlawfully enrich themselves by paying and receiving illegal kickbacks and bribes in exchange for providing Medicare beneficiary information that was used to submit claims to Medicare.

D.   **OVERT ACTS:**

34.   In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Eastern District of Louisiana and elsewhere, the following overt acts:

35.   On or about March 5, 2013, **LOUELLA GIVENS** paid and caused to be paid, $900 to Co-conspirator A, in exchange for the referral of Medicare beneficiaries for home health care services.

36.   On or about April 10, 2014, **LOUELLA GIVENS** paid and caused to be paid, $500 to Co-conspirator B, in exchange for the referral of Medicare beneficiaries for home health care services.

37.   On or about August 11, 2014, **LOUELLA GIVENS** paid and caused to be paid, $1,000 to Co-conspirator B, in exchange for the referral of Medicare beneficiaries for home health care services.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF HEALTH CARE FRAUD FORFEITURE

1. The allegations contained in Counts One through Four of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture to the United States pursuant to the provisions of Title 18, United States Code, Section 982(a)(7).

2. As a result of the offenses alleged in Counts One through Four, defendants **LOUELLA GIVENS, CRYSTAL SOLOMON** and **ZANDRIA JOHNSON** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense as a result of the violations of Title 18, United States Code, Sections 371, 1343, 1347 and 1349, which are Federal health care offenses within the meaning of Title 18, United States Code, Section 24.

3. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred, sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property;

All in violation of Title 18, United States Code, Section 982(a)(7).

A TRUE BILL:

███████████████████

FOREPERSON

KENNETH ALLEN. POLITE, JR.
UNITED STATES ATTORNEY

_/s/ William Kanellis_
WILLIAM KANELLIS
TRIAL ATTORNEY
CRIMINAL FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE
Virginia Bar No. 40770

New Orleans, Louisiana
June 17, 2016

FORM OBD-34

No. _____

# UNITED STATES DISTRICT COURT

__Eastern__ District of __Louisiana__

__Criminal__ Division

## THE UNITED STATES OF AMERICA

vs.

### LOUELLA GIVENS, CRYSTAL SOLOMON, and ZANDRIA JOHNSON

## INDICTMENT

INDICTMENT FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD and WIRE FRAUD, HEALTH CARE FRAUD, CONSPIRACY TO PAY HEALTH CARE KICKBACKS, HEALTH CARE FRAUD, AND FORFEITURE

**VIOLATIONS:** 18 U.S.C. § 1349, 18 U.S.C. § 1347, 18 U.S.C. § 371, 18 U.S.C. § 2, and 18 U.S.C. § 982(a)(7)

A true bill:

_____
Foreperson

Filed in open court this _____ day of _____ A.D. 2016.

_____
Clerk

Bail, $ _____

_____
WILLIAM J. KANELLIS, Trial Attorney